**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MICHAEL BARROUK,** | : | **Civil No. 3:14-CV-1102** |
| | : | |
| **Plaintiff** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **v.** | : | |
| | : | |
| **PNC BANK, N.A.,** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM OPINION

## I.   INTRODUCTION

In this action, Michael Barrouk ("Plaintiff") has sued his former employer, PNC Bank, N.A. ("Defendant," "PNC" or "the Bank"), pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., alleging that the Bank discriminated against him on the basis of gender, and retaliated against him for complaining about gender discrimination, when it treated female employees more favorably than him when it terminated his employment as a Commercial Market Relationship Manager after he admittedly falsified an internal Call Report in 2012, which indisputably constituted an act of dishonesty and a violation of the Bank's Code of Business Conduct and Ethics ("Code of Ethics").  Although the plaintiff admits to having committed this infraction, he nevertheless maintains that the Bank terminated his employment for a discriminatory purpose, and that the Bank treated him less favorably than other female counterparts during his employment.

Pointing to what he claims is comparator evidence showing that other employees who had committed acts of dishonesty were disciplined less severely, Barrouk contends that the bank's stated basis for terminating his employment was pretextual.

For the reasons that follow, we will recommend that the motion for summary judgment be granted.

## II.  FACTUAL BACKGROUND

On January 27, 2006, PNC hired Barrouk as a Business Advisor in the Business Banking, Branch Commercial Lending Department, in Wilkes-Barre, Pennsylvania.  (Doc. 33, Def. Statement of Undisputed Facts ("Def. SMF") ¶ 1.) Barrouk worked primarily out of the Wilkes-Barre office at all times during his employment with the Bank, though he also had office space available in Scranton. (*Id.* ¶ 2.)  Michael Pacyna ("Pacyna") interviewed and hired Barrouk and served as his direct manager for the duration of his employment.  (*Id.* ¶ 3.) Pacyna's team consisted of four Relationship Managers as well as an Associate Relationship Manager. (*Id.* ¶ 7.)

Sometime after he was hired, Barrouk's title changed to "Relationship Manager I" within the Commercial market business segment ("Commercial Market"), although his duties and responsibilities remained the same.  (*Id.* ¶ 4.)  A

little more than five years after his initial hire, Barrouk was promoted to Relationship Manager II within the Commercial Market.  Pacyna was involved in the decision to elevate Barrouk.  (*Id.* ¶¶ 4-5.)

As part of his duties as a Relationship Manager II, Barrouk was responsible for maintaining a book of Commercial Market business, and was expected to develop potential clients within his market, as well as to generate revenue for the Bank through lending and other banking opportunities.  (*Id.* ¶ 6.)  Barrouk and Richard Hodgen ("Hodgen") were the Relationship Managers reporting to Pacyna within the Commercial Market, handling business accounts ranging from $10,000,000 to $30,000,000 in annual revenue.  (*Id.* ¶ 8.)

Annmarie Andrejko ("Andrejko") and Christopher Brown ("Brown") were Relationship Managers reporting to Pacyna within the Middle Market business segment ("Middle Market"), and handled business accounts that had $30,000,000 or more in annual revenue.  (*Id.* ¶ 9)  Andrejko, like Pacyna, worked out of Scranton.  (*Id.* ¶¶ 2, 9.)  Andrejko has worked for the Bank since 1995, and has been a Middle Market Relationship Manager since 2004.  Brown has been with the Bank since 1995, and has significantly more experience than Barrouk in terms of banking.  (*Id.* ¶ 10.)

As is reflected in the different sizes of the business accounts serviced, Middle Market accounts produce more revenue, and have greater potential for higher revenue, than Commercial Market accounts.   The two markets also differ in terms of their needs, and the Bank's own business objectives in terms of these markets are different.   Commercial Market accounts are seen as less complex than Middle Market accounts, and Relationship Managers servicing Middle Market accounts require a different skill set than Relationship Managers working in Commercial Market.   (*Id.* ¶¶ 10-12.)   The Bank has noted that Relationship Managers in Commercial Market had different business goals than Relationship Managers in Middle Market, and were also subject to different management. Relationship Managers servicing clients in Middle Market generally have more experience than those working in Commercial Market, and are held to different standards. (*Id.* ¶ 13.)

Nicole Costanzo ("Costanzo") was as Associate Relationship Manager in the Bank's Scranton office from June 2009 until March 2012.   In that role, Costanzo provided support to all of Pacyna's Relationship Managers, including Barrouk, although Barrouk maintains that Costanzo provided more support to Andrejko. (*Id.* ¶ 14; Pl. Response ("Pl. SMF") ¶ 14.)   Costanzo did not hold the same responsibilities as a Relationship Manager, did not have sales or revenue goals, and

was not subject to the same incentive plan as Relationship Managers. (Def. SMF ¶ 15.)

When she started at PNC as an Associate Relationship Manager, Costanzo spent most of her time assisting Barrouk, although later she worked with all Relationship Managers and ultimately spent most of her time supporting Mike Dennen ("Dennen"), a Relationship Manager on the Public Finance team who did not report to Pacyna. In general, Pacyna did not direct Costanzo regarding the Relationship Managers she should provide services to; this was typically driven by the needs of individual Relationship Managers. (*Id.* ¶ 16.)

As part of his job as a Relationship Manager, Barrouk was required to conduct periodic relationship reviews with existing Bank clients. A relationship review is an in-person meeting with a client for purposes of reviewing the client's relationship with the Bank, and discussing the services that may be of benefit to them. In order to receive credit for holding a relationship review, a Relationship Manager was required to conduct and participate in the review, and to document the review by creating an internal Call Report. (*Id.* ¶18.)

In early 2011, Barrouk received an offer of employment from another bank. PNC encouraged Barrouk to stay on by offering him a $25,000 raise, a $15,000

bonus, and promotion to Vice President.  Barrouk accepted the offer and remained with the Bank, a decision that he was pleased with for months.  (*Id.* ¶¶ 19-21.)

Pacyna reviewed Barrouk's performance annually.  (*Id.* ¶ 22.)  From 2006 through 2010, Pacyna rated Barrouk's performance as "Achieves", and in 2011 he was graded as "Meets All Expectations," which reflected a change in the annual review format but generally appears to have been consistent with prior reviews. (*Id.* ¶ 23.)  Barrouk never complained that his reviews were unfair or otherwise discriminatory.  (*Id.* ¶ 24.)

Barrouk has acknowledged that in 2012, his performance fell below the Bank's expectations.  (*Id.* ¶ 25; Barrouk Dep. at 22, 110.)  On or about May 9, 2012, Pacyna administered a verbal warning to Barrouk because he was falling behind on his targets for relationship reviews, call activity, and revenue production.  (Def. SMF ¶ 26.)  Barrouk seems to agree that the Bank's goal was that he complete 12-15 relationship reviews in 2012, and that he was well off the pace necessary to meet this target.  (*Id.* ¶ 27; Pl. SMF ¶ 27.)  When Pacyna issued the verbal warning, Barrouk had fallen far behind Hodgen in terms of call activity and relationship reviews.  (*Id.* ¶ 28.)  Pacyna directed Barrouk to demonstrate immediate, consistent and sustained improvement in the areas where he had fallen below the Bank's expectations.  (*Id.* ¶ 29.)

PNC maintains a Code of Ethics for its employees, which requires them to act honestly and ethically at all times.  (*Id.* ¶ 30.)  In relevant part, the Code of Ethics provides as follows:

> Business records should always be prepared honestly and accurately.  We must never be dishonest or deceptive in creating or maintaining PNC records, or otherwise attempt to mislead PNC customers, management, auditors, or regulators.

(*Id.*)  Barrouk received a copy of the Code of Ethics upon his hire in 2006, and on an annual basis he acknowledged in writing that he had read the Code of Ethics, that he understood it, and agreed to comply with its requirements.  (*Id.* ¶ 31.) Barrouk also acknowledged that it is important for all Bank employees to be fully compliant with the Code of Ethics, to be honest and truthful at all times, including in the creation of Call Reports that document relationship reviews.  (*Id.* ¶¶ 32-33.)

PNC considers the falsification of a Call Report as a dishonest act under the Bank's fidelity bonding policy.  (*Id.* ¶ 35; Doc. 33, Ex. G, Declaration of Theresa Wnuk ("Wnuk Decl.") ¶ 4.)   Employees who are found to have engaged in a dishonest act are deemed to have violated PNC's Code of Ethics and are no longer covered under the Bank's fidelity bond, and therefore are no longer employable under the Bank's bonding policy.  (*Id.* ¶ 35.)

On May 25, 2012, Barrouk admittedly falsified a Call Report by indicating that he had met with a Bank client identified in the parties' papers only as "A.N.P." as part of a relationship review.  (*Id.* ¶ 38; Pl. SMF ¶ 38.)  The parties generally dispute the facts that led to the creation of this false Call Report, but there is no dispute that Barrouk generated the Call Report, and that he knew it was false.  It appears uncontested that A.N.P. had been a client assigned to Barrouk, but was subsequently reassigned to Andrejko, and on or about May 15, 2012, a Bank Treasury Management Sales Officer named Sharon  Mundrake ("Mundrake") had met with A.N.P.  Barrouk did not attend that relationship review, although Barrouk maintains that he should have been included, and would be unable to get credit for the relationship review unless he had participated.  (Def. SMF ¶ 36-37; Pl. SMF ¶¶ 36-37.)  Believing that he rightly deserved credit for the relationship review he neither initiated nor attended, Barrouk prepared a Call Report that contained a number of falsehoods, principally by affirmatively representing that he had attended and conducted the relationship review, which he had not.  (Pl. SMF ¶¶ 41-43.)

As a part of his duties as Market Manager, Pacyna regularly reviewed the Call Reports of his subordinate employees, as well as those of Mundrake, on a weekly basis.  During a review conducted after May 25, 2012, Pacyna discovered

that both Mundrake and Barrouk had filed Call Reports indicating that each had conducted a relationship review with A.N.P.   (Def. SMF ¶ 40.)   Upon being questioned by Pacyna, Barrouk readily acknowledged that he had filed the report, and acknowledged that he had neither conducted nor attended the review with A.N.P., but had "put it down as one for [him]." (*Id.* ¶ 41.)  Barrouk acknowledged that he created the report so that he could obtain credit for having conducted the relationship review – which he believed was rightfully his to conduct.  (*Id.* ¶ 42; Pl. SMF ¶ 42.)

On May 29, 2012, Barrouk met with Regional President Peter Danchak ("Danchak") to discuss a list of five accounts which he felt he had been treated unfairly over the previous five years, and indicated his concern that Pacyna was treating Andrejko more favorably than him.   (Def. SFM ¶ 45; Pl. SMF ¶ 44.) During this meeting, Barrouk was focused largely on an account for a client known as P.T., which Barrouk believed should have been assigned to him instead of Andrejko.   (Pl. SMF ¶ 45.)   The Bank notes that in his testimony, Barrouk indicated that the P.T. had originally been assigned to him, but it appears he never made contact with the account, and P.T. later reached out to Pacyna, with whom the company had formerly dealt.   It also appears that P.T. indicated it was expanding and anticipated revenue in excess of $40,000,000, which would place

the account in the Middle Market served by Andrejko, not the Commercial Market in which Barrouk worked.  (Def. SMF ¶ 46.)  The Bank ultimately did enter into a relationship with P.T., and Pacyna assigned the account to Andrejko as a Middle Market account.  (*Id.*)

Barrouk also complained to Danchak about communication problems with Pacyna; that Andrejko did not want him involved in a particular client hand-off even though Barrouk had a relationship with the to-be-transferred client; that Pacyna should have assigned him an account for a client with revenues in the area between the Commercial and Middle Markets, though he acknowledged that Pacyna had discretion in this "grey area".  (*Id.* ¶ 47.)  It appears that Barrouk believed that Andrejko was being treated more favorably than he was and that he believed there was no other explanation than that Ms. Andrejko was a woman and he was a man, although the Bank points to Barrouk's own testimony to show that he never complained he was being treated less favorably on the basis of gender.  (Def. SMF ¶ 48; Pl. SMF ¶ 49.)  Barrouk followed up on his initial complaints to Danchak, and requested a follow-up meeting with Danchak and Pacyna.  That meeting took place on June 6, 2012, and the men went over the five accounts that Barrouk had identified as cause for his concern.  Although Barrouk seems to dispute his own deposition testimony, it appears that at no time during the meeting

did Barrouk mention that he believed he was being discriminated against on the basis of his gender, or point to examples of perceived gender-based discrimination that he believes he experienced.  (Def. SMF ¶¶ 52-53; Pl. SMF ¶ 52.)

On June 5, 2012, Pacyna contacted the Bank's Employee Relations Information Center about Barrouk's admitted falsification of the Call Report. (Def. SMF ¶ 54.)   Theresa Wnuk, the Bank's Senior Employee Relations Investigator, investigated the issue and conducted interviews with Barrouk, Pacyna, Danchak, and Mundrake.  (Def. SMF ¶ 56.)   Ms. Wnuk interviewed Barrouk on June 14, 2012, and during this interview he admitted to her that he had created the false Call Report, which showed that he had attended a relationship review with A.N.T., though he had not done so.  (Def. SMF ¶ 57.)  On June 20, 2012, Wnuk placed Barrouk on paid administrative leave for this violation of the Bank's policies.  (Def. SMF ¶ 58.)  On the same day, Barrouk complained to Wnuk that he felt the investigation had been undertaken in retaliation for his complaints to Danchak about Pacyna.  (Def. SMF ¶ 59; Pl. SMF ¶ 58.)

According to Wnuk, she found that Barrouk's suspicions were unfounded, and she recommended to the Corporate Banking line of business that Barouk's employment should be terminated for dishonesty and a violation of the Bank's Code of Ethics.  (Def. SMF ¶ 61; Wnuk Dep. at 12, 100-101.)

It appears that Wnuk's recommendation was met with some initial ambivalence by others within the Bank.  Evidence  indicates that Pacyna and others did not want to terminate Barrouk's employment, but instead suggested that a reprimand or warning would suffice.  (Def. SMF ¶ 62.)   However, according to Wnuk, the violation in question represented a breach of the Bank's Code of Ethics as an act of dishonesty under the Bank's fidelity bonding policy, and therefore caused him to be no longer employable.   The Bank followed this guidance and terminated  Barrouk's employment, notwithstanding  the  initial  reservations expressed by some.  (*Id.*)  On July 3, 2012, Wnuk telephoned Barrouk and told him that his employment was terminated for dishonesty – falsification of a Call Report. (*Id.* ¶ 63.)   The Bank subsequently hired Angelo DeCesaris, a male, to replace Barrouk.[1]

Between 2008 and 2012, PNC terminated thirteen employees in the Northeast Pennsylvania market for dishonesty – falsification of business records. Of those employees, nine were women, and four were men.  (Def. SMF ¶ 66.) Barrouk does not so much dispute this fact as he does point to other evidence of

---

[1] Barrouk contends that Costanzo had some interest in pursuing the job, but decided against it because she was pregnant and believed it was not the right time.  (Pl. SMF ¶ 63.)

other acts by Bank employees that violated some other Bank policies, but who were not terminated for these violations.  (Pl. SMF ¶ 65-66.)

## III.   PROCEDURAL HISTORY

On December 5, 2012, Barrouk filed a Charge of Discrimination with the Pennsylvania Human Relations Commission ("PHRC"), which was cross-filed with the Equal Employment Opportunity Commission ("EEOC").  In the charge, Barrouk alleged that the Bank discriminated against him on the basis of sex (male) and retaliated against him for complaining about sex discrimination to supervisors. (Def. SMF ¶¶ 67-68.)  On March 17, 2014, the EEOC issued Barrouk a "Notice of Right to Sue."  (*Id.* ¶ 68.)  On June 6, 2014, Barrouk filed the complaint initiating this action.  (Doc. 1.)

## IV.   DISCUSSION

### A.   Summary Judgment Standard

The Bank has moved for judgment pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. Rule 56(a).  Through summary adjudication a court is empowered to dispose of those claims that do not present a "genuine dispute as to any material fact," Fed. R.

Civ. P. 56(a), and for which a trial would be "an empty and unnecessary formality." Univac Dental Co. v. Dentsply Int'l, Inc., 702 F. Supp. 2d 465, 468 (M.D. Pa. 2010). The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. Id. at 248-49.

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004). Once the moving party has shown that there is an absence of evidence to support the nonmoving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at

322.   Summary judgment is also appropriate if the non-moving party provides merely colorable, conclusory, or speculative evidence.  <u>Anderson</u>, 477 U.S. at 249. There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts.  <u>Id.</u> at 252; <u>see also</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). In making this determination, the court must "consider all evidence in the light most favorable to the party opposing the motion."  <u>A.W. v. Jersey City Pub. Schs.</u>, 486 F.3d 791, 794 (3d Cir. 2007).

**B.    Barrouk's Motion to Strike**

Before turning to the substance of the parties' arguments, the Court must first resolve a motion that Barrouk filed seeking entry of an order striking the Declaration of Theresa Wnuk, the Bank employee who investigated Barrouk's act of dishonesty, as well as the Bank's reply brief.  (Doc. 56.)  The motion appears chiefly aimed at striking information that Wnuk provided regarding an alleged comparator employee who, as discussed more fully below, engaged in an act of misconduct at a Bank retail branch by releasing a cashier's check to a non-signatory on an account.  Barrouk argues that the information contained in the affidavit should not be considered because it is hearsay; because the affidavit is, according to Barrouk, a sham that was generated to support the motion for

summary judgment; and that the affidavit and other documents Wnuk relies on were not produced in discovery.

The Court has considered Barrouk's arguments and finds them unpersuasive.

Rule 12(f) of the Federal Rules of Civil Procedure governs motions to strike pleadings and provides, in part, that "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f).  While rulings on motions to strike rest in the sound discretion of the court, Von Bulow v. Von Bulow, 657 F.Supp. 1134, 1146 (S.D.N.Y. 1987), that discretion is guided by certain basic principles. Because striking a pleading is viewed as a drastic remedy, such motions are "generally disfavored." Kaiser Aluminum & Chemical Sales, Inc. v. Avondale Shipyards, Inc., 677 F.2d 1045, 1057 (C.A.La., 1982).   As one court has aptly observed: "striking a party's pleadings is an extreme measure, and, as a result, . . . '[m]otions to strike under Fed .R.Civ.P. 12(f) are viewed with disfavor and are infrequently granted.'  Lunsford v. United States, 570 F.2d 221, 229 (8th Cir.1977) (citing 5 Wright & Miller, Federal Practice and Procedure. Civil § 1380 at 783 (1969)). See also, Resolution Trust Corp. v. Gibson, 829 F.Supp. 1103, 1106 (W.D.Mo.1993); 2 James Wm. Moore et al., Moore's Federal Practice § 12.37[1] (3d ed. 2000)." Stanbury Law Firm v. I.R.S., 221 F.3d 1059, 1063 (8th Cir. 2000).   In practice,

courts should exercise this discretion and strike pleadings only when those pleadings are both "redundant, immaterial, impertinent, or scandalous" and prejudicial to the opposing party. Ruby v. Davis Foods, Inc., 269 F.3d 818, 820 (7th Cir. 2001). Moreover, consistent with this sparing approach urged by the courts with respect to motions to strike, those "pleadings" that may be subject to a motion to strike are construed narrowly. Recognizing that briefs are, by their nature, argumentative and sometimes contentious filings, it is generally held that a brief–as opposed to other forms of pleadings – typically will not be considered a "pleading" which is properly the subject of a motion to strike. Hrubec v. National R.R. Passenger Corp., 829 F.Supp. 1502, 1506 (N.D.Ill.,1993), citing Anna Ready Mix, Inc. v. N.E. Pierson Const. Co., 747 F.Supp. 1299, 1303 (S.D.Ill.1990), and Board of Education v. Admiral Heating and Ventilation, Inc., 94 F.R.D. 300, 304 (N.D.Ill.1982).

In this case, upon consideration of this motion to strike we find, first, that to the extent that object of that motion is portions of a reply brief, this brief is not the appropriate subject of a motion to strike. Hrubec v. National R.R. Passenger Corp., 829 F.Supp. 1502, 1506 (N.D.Ill.,1993). Furthermore, recognizing that "[m]otions to strike under Fed .R.Civ.P. 12(f) are viewed with disfavor and are infrequently granted," Lunsford v. United States, 570 F.2d 221, 229 (8th Cir.1977),

we also find that it has not been shown that the assertions in this brief are both "redundant, immaterial, impertinent, or scandalous" and unfairly prejudicial.  Ruby v. Davis Foods, Inc., 269 F.3d 818, 820 (7th Cir. 2001).  Therefore, in the exercise of our discretion, Von Bulow v. Von Bulow, 657 F.Supp. 1134, 1146 (S.D.N.Y. 1987), we will deny this motion to strike portions of this reply brief and Wnuk's affidavit.  However, because we understand the concerns that motivated the plaintiff to file this pleading, the Court will, instead, treat this motion to strike as a sur-reply brief on the pending summary judgment motion, and will consider the plaintiff's arguments in ruling upon that motion.  Additionally, the Court has considered Wnuk's affidavit within the context of the overall record, and has considered the parties' competing briefs in connection with determining whether there exist disputed issues of material fact that require resolution of the discrimination and retaliation claims at trial.  As explained below, the entirety of the record evidence and the parties briefs cause the Court to find that summary judgment is indeed warranted.

## C.     Title VII Discrimination

Barrouk claims that PNC discriminated him on the basis of his gender by treating other female employees more favorably than him, and more pointedly when it terminated his employment for admittedly falsifying a Call Report which

the Bank deemed to be a violation of its Code of Ethics. The Bank maintains that the incidents of alleged discrimination during his employment are unsupported and *de minimis*, and that the eventual termination of Barrouk's employment was not discriminatory but was instead compelled by Barrouk's admitted act of misconduct that rendered him unemployable under the Bank's bonding policy. The Bank also emphasizes that although he carries the burden of proof of demonstrating that the allegedly adverse employment actions were actually discriminatory in nature, Barrouk has come forward with no evidence that could possibly support such a finding.

Title VII prohibits employment discrimination based on an individual's sex or gender. 42 U.S.C. § 2000e-2(a). To establish a *prima facie* case of gender-based employment discrimination under Title VII, a plaintiff must demonstrate that: "(1) s/he is a member of a protected class; (2) s/he was qualified for the position s/he sought to attain or retain; (3) s/he suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination." *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008); *see also Jones v. Se. Pa. Trans. Auth.*, 796 F.3d 323 (3d Cir. 2015); *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 348 n.1, 352, 356, 357 (3d Cir. 1999). The requirements of the *prima facie* standard are "flexible." *Pivirotto*, 191

F.3d at 357, and an inference of discrimination may be developed "in a number of ways, including, but not limited to, comparator evidence," or other evidence of similar discrimination towards other employees. *See Selvato v. Se. Pa. Trans. Auth.*, -- F. Supp. 3d --, 2015 WL 6181351, *6 (E.D. Pa. Oct. 21, 2015) (citing *Golod v. Bank of Am. Corp.*, 403 F. App'x 699, 702 n.2 (3d Cir. 2010).

If a plaintiff establishes a *prima facie* case, then "the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action." *Id.* If the defendant meets that test, a plaintiff may nevertheless prevail by showing that "the defendant's proffered reason is merely pretext for intentional discrimination." *Id.* A plaintiff can meet this burden by coming forward with evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Burton v. Teleflex Inc.*, 707 F.3d 417, 427 (3d Cir. 2013) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)).

Under that first approach, evidence sufficient to allow a factfinder to disbelieve the employer's legitimate reasons requires a plaintiff to show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in

the employer's proffered legitimate reasons" that a jury could find that the employer did not actually act for non-discriminatory reasons. *Fuentes*, 32 F.3d at 765. A plaintiff cannot merely show that the employer's decision was "wrong or mistaken," because the issue is the employer's motivation – not whether the decision was sound. *Id.* Moreover, the plaintiff must point to inconsistencies that would be significant enough to discredit the logic of the proffered legitimate reason. *Id.*; *see also Schroder v. Pleasant Valley Sch. Dist.*, 458 F. App'x 128, 130 (3d Cir. 2012).

Under the second approach, a plaintiff may come forward with evidence that would show that the employer treated similarly situated comparators more favorably. In order to demonstrate discrimination by showing comparators, "comparator employees must be similarly situated in all relevant respects," the determination of which "takes into account factors such as the employees' job responsibilities, the supervisors and decision-makers, and the nature of the misconduct engaged in." *Wilcher v. Postmaster Gen.*, 441 F. App'x 879, 882 (3d Cir. 2011). It is not necessary to show that misconduct in which employees engaged was identical since comparators who committed offenses that were of "comparable seriousness" may satisfy a plaintiff's burden. *Opsatnik*, 335 F. App'x at 223) (quoting *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 710 (7th Cir. 2006)).

Sometimes, however, the circumstances of a plaintiff's misconduct may justify treating him differently than similar comparators. *See George v. Lehigh Valley Health Network*, 2014 WL 1464327, *4 (E.D. Pa. April 15, 2014).  Additionally, the Third Circuit has instructed that although "identification of one or two comparators may be sufficient at the *prima facie* stage of analysis, it is not sufficient at the pretext stage."  *Ray v. Pinnacle Health Hospitals, Inc.*, 416 F. App'x 157, 164 (3d Cir. 2010) (citing *Simpson v. Kay Jewelers*, 142 F.3d 639, 645-46 (3d Cir. 1998)).

In this case, we find that Barrouk has failed to come forward with sufficient evidence to make out a *prima facie* case of discrimination, and find further that Barrouk has not effectively demonstrated that there exists a genuine issue of material fact that the Bank's proffered legitimate, non-discriminatory reason for terminating Barrouk's employment was pretextual.

First, it appears that Barrouk is claiming that he suffered workplace discrimination because Pacyna treated other female employees preferentially, by denying Barrouk access to his calendar; by spending less time in the commercial market with Barrouk than with Andrejko; by providing her with better accounts; by failing to assign goals to Costanzo; and by instructing Costanzo to give greater administrative support to Andrejko than to him.  To the extent Barrouk is

endeavoring to support his discrimination claim with these examples of differential treatment, we find that he falls far short of what is required to make out a claim.

It is well-established that to demonstrate an adverse employment action, a plaintiff must show that he experienced "[a] tangible employment action constitut[ing] a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits . . . A tangible employment action in most cases inflicts direct economic harm." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761-62 (1998); *see also Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004) (identifying as an adverse employment action "an action by an employer that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment."). Regarding his day-to-day work experience, and the asserted differences in his relationship with Pacyna than that enjoyed by Andrejko or even Costanzo, we do not find that Barrouk has satisfied his burden of demonstrating a "tangible employment action." At best he has shown that two subordinates of Pacyna who were differently classified than Barrouk had a different relationship with their supervisor. Andrejko worked with larger accounts, and Costanzo provided administrative support to the other Relationship Managers, and thus there does not appear to be anything

unusual about the fact that Pacyna would interact differently with these employees, or provide them with different levels of support and direction.  At most Barrouk seems to be endeavoring to aggregate minor differences in his employment in an attempt to create the impression of a discriminatory workplace, but his showing fails even to demonstrate tangible or material difference in employment conditions.

Likewise, these examples of purportedly differential treatment fail because the employees are not similarly situated.  As noted above, the fourth prong of the prima facie test requires that a plaintiff show that "similarly situated" employees were treated differently.  But here the employees to whom Barrouk compares himself were not similarly situated to him.  Similarly situated employees are those who have "dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Opsatnik v. Norfolk S. Corp.*, 335 F. App'x 220, 223 (3d Cir. 2009); *see also Greene v. Virgin Islands Water & Power Auth.*, 557 F. App'x 189, 195-96 (3d Cir. 2014) (employees with different responsibilities generally are not similarly situated).  The evidence is clear that aside from being subordinate employees of Pacyna, Ajdrejko and Costanzo were not similarly situated to Barrouk.  Rather they had greater or lesser responsibilities, respectively, and the reasons why they would

have different levels of support from Pacyna do not appear in any way discriminatory.

In this regard, Barrouk has in no way pointed to facts and circumstances that could give rise to a reasonable inference of discrimination.   Barrouk himself conceded that there is no evidence that Pacyna's alleged different treatment of Andrejko was based on her gender.  (Def. SMF ¶¶ 71-72; Pl. SMF ¶¶ 26-27, 38-39.)  Indeed, Barrouk acknowledged that Pacyna's different treatment of Andrejko – who worked with different clients, and who had a different level of responsibility than Barrouk – could have been for numerous reasons having nothing to do with gender, including that the two may have had a better interpersonal working relationship, or that Pacyna cared more about the Middle Market over the Commercial Market, or simply because he liked Andrejko more.   We find Barrouk's suggestion that Pacyna's treatment of Andrejko could support an inference of discrimination to be unpersuasive and unsupported by the facts.

With respect to Costanzo, the evidence shows that she was an Associate Relationship Manager.  (*Id.* ¶¶ 7-8, 14-16.)  In this capacity, Costanzo's primary job was to provide support to other Relationship Managers, and she accordingly had no assigned revenue or sales goals – she performed a different function than more senior Relationship Managers like Barrouk or Andrejko.  (*Id.* ¶¶ 14-16.)  It is

clear from the record that Barrouk and Costanzo were differently situated employees, and we find his suggestion that Pacyna's different approach to her as her supervisor was an example of gender-based preferences is totally unsupported.

Moving past these isolated examples of perceived workplace bias, Barrouk's claim of discrimination plainly is rooted in his eventual termination after he was found to have violated the Bank's Code of Ethics by falsifying a Call Record. There is no legitimate dispute in the record that Barrouk committed this violation, and that it was an explicit violation of the Bank's Code of Ethics. There is also no dispute in the record that the Bank has previously terminated 13 other employees in the Northeast Pennsylvania market, of whom nine were female, for falsifying documents like Barrouk. (Def. SMF ¶¶ 64-66; Pl. SMF ¶¶ 64-66.) There is also no dispute that after he was terminated, Barrouk was replaced with a male hire. Nevertheless, Barrouk attempts to rebut the Bank's proffered legitimate, non-discriminatory reason for terminating his employment by arguing that the stated reason is pretextual. His effort falls short.

First, Barrouk endeavors to suggest that three alleged comparator employees were disciplined less severely than he was for similar ethical violations. Two of the comparators Barrouk identifies are women: Joleen Astorino ("Astorino") and Constance Smith ("Smith"). Barrouk contends that these employees also engaged

in conduct that violated Bank policies, and yet were not sanctioned with termination. Barrouk's efforts to create the impression of similarly situated employees fails, however, because the alleged comparators are not similarly situated to him, and committed different infractions.

The evidence shows that in 2007, Smith worked in the Bank's retail banking line of business. (Doc. 53-1, Wnuk Decl. ¶ 8.) This line of business is distinct from the Commercial Market where Barrouk worked, and provides banking products and services to individual and business customers. (*Id.* ¶ 9.) Smith worked as a Teller Supervisor II at the Hawley, Pennsylvania branch office, with primary responsibilities for driving the operations of the teller staff, the customer experience, and other teller functions within the branch. (*Id.* ¶ 8, Ex. B.) Smith's direct supervisor was Betsy Burger. (*Id.* ¶ 8.)

In August 2007, Smith was investigated by the Bank for issuing a cashier's check to an individual who was not a signer on a business account. (*Id.*) During the investigation, it was determined that the person to whom the check had issued was associated with the business and was well known both in the community and by others at the branch office, who had also issued cashiers' checks to her without having checked to determine if she was listed as a signer on the account. Smith

was found to have violated the Bank's policy and procedure in this regard, and was placed on probation.  (*Id.*)

Astorino also worked in the Bank's retail line of business.  In 2010, she held the position of Branch Manager I, with primary responsibilities for managing a retail bank branch and its staff.  (*Id.* ¶ 7, Ex. A.)  Her direct supervisor was Regional Manager Michael Brundage.  (*Id.* ¶ 7.)  In 2010, a Bank investigation found that in 2007, Astorino notarized a document without the signers in front of her.  At that time, this violation was deemed to be a violation of Bank policy and procedure, but did not constitute a violation of the Code of Ethics.  (Doc. 51-6, August 15, 2015, Deposition of Theresa Wnuk ("Wnuk August Dep.") pp. 171-72, 177.)  As punishment for this violation, Astorino was placed on final written warning.  (*Id.*, pp. 198-99.)

As noted above, Barrouk has the burden of demonstrating that other employees were "similarly situated" to him for purposes of suggesting that a difference in discipline or workplace conditions is suggestive of discrimination, or could support an inference of discrimination.  Here he has not done so.  The evidence is undisputed that Smith and Astorino worked in a different division of the Bank, with different responsibilities, and with different supervisors; and the evidence is also clear that each of these employees was found to have violated a

different bank policy or rule than Barrouk did when he deliberately falsified a Call Report to make it appear as if he had conducted a relationship review that he knew he did not attend, in order to get credit for it. Although we recognize that offenses need not be identical in order for employees to be deemed "similarly situated," their conduct must of be "of comparable seriousness." *Opsatnik*, 335 F. App'x at 223. Courts have also found that "[i]n assessing comparators, the employer's subjective believe may be more important tha[n] the actual, true situation of the comparators." *George*, 2014 WL 1464327, at *10-11.

Here, the Bank maintains that Smith's issuance of a cashier's check to an unauthorized signer on a business account and Astorino's notarization of a document in the absence of the signers were materially different than Barrouk's deceptive and dishonest act, and were treated as such. Barrouk does not persuasively explain how his admitted violation of the Code of Ethics through an act of deceit regarding his own contact with a Bank client is comparable to the issuance of a cashier's check to a client who was known within the branch, or in Astorino's violation of the Bank's notary rules. Theresa Wnuk attested that with respect to Astorino's violation, the Bank did not even consider that at the time to be a violation of the Code of Ethics, and Barrouk's own disagreement with that assessment is insufficient to overcome the Bank's subjective interpretation of its

own policies and procedures. *Id.* Furthermore, Barrouk has offered nothing to suggest how the misconduct of these two employees who worked in an entirely different division of the Bank, and the discipline that was imposed against each, had anything to do with gender. These employees were not similarly situated, either in their actual scope of employment or in their violation of Bank rules, and thus do not serve as valid comparators either to make out a *prima facie* case of discrimination, or to show that the Bank's proffered non-discriminatory reason for terminating Barrouk was pretextual.

Finally Barrouk claims that in 2005, an unidentified male Bank employee opened five accounts without the consent or authorization of the account holder, and yet was not terminated. (Doc. 52, Pl. Brief, p. 4.) Curiously, the plaintiff makes this assertion based upon some vague affidavit testimony offered by John Dorneman, which does not identify the employee, or his position, or where he worked, or who supervised him. To the extent that the plaintiff relies solely on the affidavit given by John Dorneman for evidence of this alleged infraction, it is problematic because nothing in the affidavit indicates that Mr. Dorneman made the representation upon his personal knowledge, or is simply basing his statement on something that he heard someone else tell him, and thus would constitute hearsay.

However, we agree with the Bank that even if the information in Mr. Dorneman's affidavit were reliable and admissible, we fail to perceive the information's significance in this case, where Barrouk is claiming that his termination was the result of gender discrimination – against a male.   Here it appears that Barrouk is offering as an example a purportedly similarly situated employee, who was also a man, and yet who did not lose his job for committing a violation of Bank rules.    It is unclear how this would support, rather than undermine, Barrouk's gender-discrimination claims here.

To the extent that Barrouk is claiming that this vague information is useful to show that the Bank's stated justification – a violation of the Bank's Code of Ethics – was a terminable offense is pretextual, we similarly disagree.   The Bank has come forward with uncontradicted evidence to show that within Barrouk's own region, the Bank has terminated 13 employees – nine of whom were women – for falsifying documents.   We do not agree with Barrouk that the shred of vague evidence regarding an unidentified male employee who purportedly committed a dishonest act seven years earlier is the quality or quantity of evidence that would suffice to create a triable issue of fact or actually create an issue regarding pretext. *See, e.g., Matushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

(1986) (non-moving party must produce more than a scintilla of evidence to meet its burden at summary judgment).

We also do not agree that the fact that the Bank took a month to terminate Barrouk's employment after it discovered that he had committed a violation of the Code of Ethics somehow undermines the Bank's proffered non-discriminatory reason for taking this step. The evidence shows that after the discovery of Barrouk's act of dishonesty, the Bank engaged in a formal investigative process that involved a consensus model to determine the appropriate discipline – a process that included Pacyna initially disagreeing with the decision to terminate Barrouk's employment. (Def. SMF ¶¶ 61-62.) Barrouk has claimed that Pacyna discriminated against him on the basis of gender, yet this evidence actually undercuts that claim, since the evidence shows that Pacyna thought a lesser form of discipline would be appropriate. The record reflects that the Bank ultimately found that the gravity of Barrouk's violation compelled his termination, which appears to be a step that was consistent with the way in which the Bank had dealt with 13 other employees who had committed a similar violation of the Code of Ethics within Barrouk's Northeast Pennsylvania region. The evidence also shows that this discipline was meted out to both men and women without regard to gender. Barrouk's suggestion that any delay in the imposition of this serious discipline

casts doubt upon the Bank's proffered justification is simply not supported by the record, and is indeed undermined by it.

### D.    Retaliation

Finally, we turn to Barrouk's claim that the Bank retaliated against him after he complained to his supervisor about gender discrimination in the workplace.

Title VII expressly protects employees from retaliation:   "It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter . . . ."  42 U.S.C. § 2000e-3(a).  In order to make out a *prima facie* case of Title VII retaliation, Barrouk bears the burden of coming forward with evidence to show that (1) he engaged in protected activity, (2) the Bank subjected him to adverse employment action, and (3) there is a causal connection between the protected activity and the adverse action.  *Moore v. City of Phila.*, 461 F.3d 331, 340-41 (3d Cir. 2006).

With respect to "protected activity," Title VII's anti-retaliation provision "protects those who participate in certain Title VII proceedings and those who oppose discrimination made unlawful by Title VII."  *Moore*, 261 F.3d at 341; *see also Curay-Cramer v. Ursuline Academy of Wilmington, Delaware, Inc.*, 450 F.3d 130, 134 (3d Cir. 2006); *Slagle v. County of Clarion*, 435 F.3d 262, 266 (3d Cir.

2006).  In order to prevail on a Title VII retaliation claim, an employee must have an "objectively reasonable" belief that the activity he opposes constitutes unlawful discrimination under Title VII.  *Wilkerson v. New Media Tech. Charter Sch.*, 522 F.3d 315, 322 (3d Cir. 2008).  It is also clear that to qualify as protected activity, a plaintiff must show that he did more than to complain of "unfair treatment in general," or otherwise to have made vague reports about perceived slights in the workplace.  *See Klastow v. Newtown Friends Sch.*, 515 F. App'x 130, 133 (3d Cir. 2013) (general complaints did not support a retaliation claim for age discrimination when the plaintiff never specifically referred to age discrimination); *Ferra v. Potter*, 324 F. App'x 189, 192 (3d Cir. 2009) ("We recognize that Appellant has alleged a long history of what he perceives as differential treatment by his supervisors.  We do not discount this information; however, it is insufficient to satisfy the requirements of 'protected activity' under Title VII."); *Barber v. CSX Distribution Servs.*, 68 F.3d 694, 701-02 (3d Cir. 1995) (explaining that general complaint about unfair treatment is insufficient to establish "protected activity" under Title VII); *Robuck v. Mine Safety Appliances Co.*, 2010 WL 4553562, at *6 (W.D. Pa. Nov. 3, 2010) ("[C]omplaints about favoritism alone do not qualify as 'protected activity' . . . .").[2]

---

[2]  In *Gautney v. Amerigas Propane, Inc.*, 107 F. Supp. 2d 634 (E.D. Pa. 2000), the district explained the showing required in terms that are closely applicable to this

To satisfy the third prong of a causal link between protected activity and the alleged adverse employment action, a plaintiff is further required to show that the protected activity in which he engaged was the "but-for" cause of the adverse action he suffered. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, -- U.S. --, 133 S. Ct. 2517, 2534, 186 L.Ed.2d 503 (2013), *Verma v. Univ. of Pennsylvania*, 533 F. App'x 115, 119 (3d Cir. 2013). This is, therefore, "a stricter causation standard than that required for discrimination claims where a plaintiff need only show that race, color, religion, sex, or national origin was a motivating factor in the employment action, rather than the but-for or sole cause." *Burton v. Pa. State Police*, 990 F. Supp. 2d 478, 509 (M.D. Pa. 2014).

---

case:

> At best, the evidence here is that Gautney complained in general terms that she thought she was being treated differently. None of the evidence, however, supports an inference that her supervisors knew she was complaining of gender or sex discrimination or that her vague complaints could reasonably lead to retaliatory animus. A mere reference to being treated differently or unfairly followed by the denial of any differential treatment is insufficient to establish that she engaged in a protected activity. In addition, what Gautney thinks Katz should have inferred from the intonation with which she asked a question as part of a longer conversation is insufficient to carry her burden on summary judgment to point to some evidence that she engaged in a protected activity.

*Id.* at 646.

The court may look at a "a broad array of evidence" to determine whether there exists a causal link for summary judgment purposes. *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 284 (3d Cir. 2000). Generally, a short temporal proximity between the protected activity and the adverse action that is "unusually suggestive" of a retaliatory motive may be sufficient to support an inference of causality. *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997). However, where the temporal proximity is not "unusually suggestive," the court will look more broadly, and consider whether "the proffered evidence, looked at as a whole,, may suffice to raise the inference." *Farrell*, 206 F.3d at 280 (quoting *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997). Additionally, a plaintiff may come forward with evidence of antagonism by the employer against him, whether the employer gave inconsistent reasons for taking the adverse action, or any other evidence that may support an inference of retaliation. *Id.* at 279-80.; *see also LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232-33 (3d Cir. 2007).

In this case, Barrouk's retaliation claim enjoys almost no support in the record. At the outset, the record is essentially barren of evidence to show that Barrouk even engaged in protected activity in the first place. Indeed, it is undisputed that Barrouk did not complain about discrimination and never indicated

his professed belief that he was being subjected to unfair treatment because of his gender. Equally importantly, the evidence shows that neither Danchak nor Pacyna subjectively interpreted Barrouk's complaints as alleging sex discrimination. (Def. SMF ¶¶ 48-53, 71.) Barrouk's general complaints about unfavorable or disparate treatment do not qualify as protected activity under Title VII, and therefore his retaliation fails as a matter of law.

But even if Barrouk's complaints somehow qualified as protected activity, the retaliation claim would still fail because he cannot establish a causal connection between his firing for engaging in an act of dishonesty and his complaints about preferential treatment. As noted, Barrouk must establish that his complaints about gender discrimination constituted a but-for cause of his eventual termination, and he simply cannot do so. There is no dispute but that Pacyna was obligated to report Barrouk's admitted act of dishonesty and violation of the Code of Ethics to others within the Bank, who were obliged to investigate the misconduct. There is no dispute that the Bank considered what Barrouk did to constitute an act of dishonesty that violated the Code of Ethics, and the Bank's fidelity bonding policy, and that it rendered him unemployable going forward. (Def. SMF ¶¶54-55.) Furthermore, as we explained above in the context of discussing Barrouk's discrimination claims, Barrouk has failed to come forward with sufficient evidence

that could suggest that the Bank's stated reasons for his ultimate discipline were pretextual.  There is simply insufficient evidence to create a disputed issue of fact regarding the reason for Barrouk's termination, and his retaliation claim fails for this reason as well.

### E.      Conclusion

For the foregoing reasons, and following a thorough review of the parties' briefs and evidence submitted in support of and opposition to PNC's motion for summary judgment, the Court finds that Barrouk's Title VII discrimination and retaliation claims fail as a matter of law and are unsupported in the evidence. Because Barrouk has not met his burden of demonstrating that there exist triable facts with respect to these claims, we are constrained to find that summary judgment in the Bank's favor is warranted.

A separate order consistent with this memorandum shall issue.

*/s/  Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge